UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:15-CR-20339-GAYLES

UNITED STATES OF AMERICA

v.

**MATTHEW PISONI, MARCUS PRADEL,**
**and VICTOR RAMIREZ**,

  Defendants.
_____/

## ORDER GRANTING NEW TRIAL

  **THIS CAUSE** comes before the Court upon Defendants', Matthew Pisoni, Marcus Pradel, and Victor Ramirez, Joint Motion for New Trial (the "Motion") [ECF No. 694]. The Court has reviewed the Motion and the record, including 766 docket entries. The record includes hundreds of pages of sealed transcripts and other exhibits obtained as part of a parallel investigation by the United States Department of Justice's Office of Professional Responsibility ("OPR"). The Court has also heard argument from counsel and is otherwise fully advised.

  On July 16, 2021, the Court held a status conference and notified the parties that it was going to grant the Motion and explained its reasons for doing so. Because the case was on appeal at that time, the Court issued an Order, [ECF No. 750], notifying the United States Court of Appeals for the Eleventh Circuit that it intended to grant the Motion if the Eleventh Circuit returned jurisdiction to it.[1] On August 5, 2021, the Eleventh Circuit remanded this matter in full to the Court. [ECF No. 755]. For the reasons stated by the Court on July 16, 2021, *see* [ECF No. 748],

---

[1] If a motion for a new trial is filed while an appeal is pending, the district court has jurisdiction to entertain the motion. *United States v. Khoury*, 901 F.2d 975, 976 n.3 (11th Cir. 1990). The Eleventh Circuit may remand the case if the Court certifies its intention to grant the motion for a new trial. *Id.*

and for the reasons set forth below, the Court hereby vacates the convictions and sentences of Defendants Matthew Pisoni, Marcus Pradel, and Victor Ramirez and orders a new trial.

## BACKGROUND

In November 2014, Matthew Pisoni ("Pisoni"), Marcus Pradel ("Pradel"), Victor Ramirez ("Ramirez"), and John Leon ("Leon") were notified by the U.S. Government that they were targets of an investigation related to their sweepstakes newsletter marketing business. The four putative defendants hired lawyers to represent them in the investigation which ultimately led to the above-captioned case. On November 7, 2014, Pisoni, Pradel, Ramirez, Leon, and their lawyers entered into a written Joint Defense Agreement ("JDA"), which provided that all shared information would remain privileged and confidential, that such information could not be shared with anyone other than the participants, that anyone seeking to withdraw from the JDA would have to provide advance written notice, and that all privileged materials previously received would have to be returned upon withdrawal from the JDA.[2] [ECF No. 162-1].

On May 7, 2015, Pisoni, Pradel, Ramirez, and Leon were indicted in the Southern District of Florida and charged with conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349 (Count 1); mail fraud, in violation of 18 U.S.C. § 1341 (Counts 2-5); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count 6); and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Counts 7-12). [ECF No. 3]. Ramirez was also charged with conspiracy to structure transactions to avoid reporting requirements, in violation of 18 U.S.C. § 371 (Count 13). *Id.* After the Indictment was returned, the four defendants and their lawyers met

---

[2] Omar Guerra Johansson, who became Leon's attorney following the Indictment, told the OPR investigators that no written joint defense agreement existed "and, in his view, no oral agreement either." [ECF No. 697-7 at 5 (under seal)]. However, there is no evidence that the parties formally withdrew from the written JDA. Even so, as the Court found at the hearing on the motion to dismiss, the defendants and their attorneys also entered into a post-Indictment oral JDA. [ECF No. 227 at 241–42].

frequently and shared information pursuant to the JDA.

On April 20, 2016, Pisoni, Pradel, and Ramirez learned that a Superseding Information, [ECF No. 149], was filed against Leon on that date, charging him with a lesser offense: one count of conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371. They also learned that Leon agreed to cooperate with the Government and that he signed a plea agreement on February 17, 2016.[3] *See* [ECF No. 155]. Unbeknownst to Pisoni, Pradel, and Ramirez, Leon met with the Government and shared information despite the JDA.

On June 29, 2016, Pisoni, Pradel, and Ramirez filed a Motion to Dismiss Indictment Based on Government Invasion of the Defense Camp. [ECF No. 162]. In the motion, they alleged prosecutorial misconduct and violations of Pisoni, Pradel, and Ramirez's Fifth and Sixth Amendment rights. On July 20, 2016, Pisoni, Pradel, and Ramirez filed a motion for production of the agents' rough notes of interviews with Leon. [ECF No. 176]. The Court conducted an initial hearing on August 3, 2016. After hearing argument, the Court reset the matter for an evidentiary hearing and ordered the Government to produce the agents' rough notes. [ECF Nos. 191, 198].

On October 17 and November 1, 2016, the Court held a two-day evidentiary hearing on the motion to dismiss. [ECF Nos. 226, 227]. The Government was represented by Assistant U.S. Attorneys H. Ron Davidson and Elijah Levitt. At that hearing, the Government disclosed that it began discussing with Leon the possibility of his cooperation on January 20, 2016. Leon signed the plea agreement on February 17, 2016, during a meeting with the Government (the "February Debrief"). The hearing further revealed that Leon met with the Government and was debriefed on at least one occasion. While meeting with the Government and providing information pursuant to his plea agreement, Leon and his attorney, Omar Guerra Johansson ("Johansson"), continued to

---

[3] Although the plea agreement was signed on February 17, 2016, and references a Superseding Information, the Superseding Information was filed with the Court two months later.

3

meet with Pisoni, Pradel, Ramirez, and their lawyers, acting as if Leon was still part of the JDA. During those meetings, confidential information was discussed by the defendants and their attorneys. In its pleadings and at the evidentiary hearing, the Government repeatedly told the Court that it did not know about the meetings that Leon continued to have with his co-defendants and their lawyers and that the Government did not receive any privileged material.

Based on the evidence presented at the hearing, the Court found that the Government improperly invaded the defense camp and obtained privileged information. However, because the Government appeared to have independent sources of much of that information, the Court found that dismissal was too extreme a remedy. [ECF Nos. 221, 227 at 241–45]. Instead, the Court struck Leon from testifying in the trial. [ECF No. 227 at 245].

On April 26, 2017, Pisoni, Pradel, and Ramirez filed a Joint Motion to Disqualify the Prosecution Team, Compel Additional Prosecution Team Discovery, and for a Taint Hearing. [ECF No. 238]. In the motion, the Defendants argued that because the Court found that Leon had shared improper information with the prosecution team[4] the additional remedy of disqualification of the prosecution team was required. The defense also sought additional discovery to determine to what extent the prosecution was utilizing the information it had already received and a *Kastigar*-type hearing to investigate the depth of the taint. The Government opposed such relief, arguing that the defense failed to prove that the Government learned defense strategies or obtained privileged information and that there was no evidence that Leon provided the Government with post-Indictment information.[5] *See* [ECF No. 245]. Following a hearing, the Court denied the

---

[4] The prosecution team for the Government included the case agents, Agents Geoffrey Burnham and Bryan Masmela, and the prosecutors, AUSAs Davidson and Levitt.

[5] The Court has since learned that around this same time, the prosecution team was giving contrary testimony to the OPR. For example, just one month before the Government filed its opposition, AUSA Levitt admitted in his submission to the OPR that the August 3, 2016 hearing revealed that "John Leon had divulged privileged joint defense materials to the Government during the February 17, 2016 debriefing and had actively solicited this information from the defense camp between January 20, 2016, and February 17, 2016." [ECF No. 697-9 at 16 (under seal)].

4

motion to disqualify the prosecution team but ordered the Government to produce additional discovery. [ECF Nos. 256, 261].

The five-week jury trial commenced on June 26, 2017. On July 26, 2017, the jury returned a verdict finding Pisoni, Pradel, and Ramirez guilty of conspiracy to commit mail fraud (Count 1), but acquitting them of all remaining counts. [ECF Nos. 342–344]. On November 28, 2017, the Court sentenced Pisoni and Ramirez to 84 months' imprisonment and Pradel to 78 months' imprisonment. [ECF Nos. 456, 458, 459].

On January 9, 2018, the Government filed a notice to correct the record, stating that during a "post-conviction review of case materials" it discovered that it had provided inaccurate information to the Court during the pretrial hearings. [ECF No. 509]. In this first of what would be several disclosures, the Government revealed that contrary to the testimony and arguments it previously made to the Court, the Government had, in fact, obtained written documents from Leon during the February Debrief, including handwritten notes and the "Timeline"[6] discussed at the evidentiary hearing. *Id*. As a result of this disclosure, Pisoni, Pradel, and Ramirez moved for the Government to produce the investigation reports, interviews, emails, and associated documents relevant to the Government's post-trial investigation into the actions of the prosecution team. [ECF No. 551].

Shortly thereafter, the U.S. Attorney's office removed AUSAs Davidson and Levitt from the case, and new Government counsel took over. These new prosecutors made additional significant disclosures, including the following: (1) a February 22-23, 2016 email chain between the prosecution team in which AUSA Levitt referenced a document provided by Leon to the Government at the February Debrief and stated that "the document was prepared in a private

---

[6] The Timeline included a corporate blueprint. *See* [ECF No. 694 at 26 n.5, 38–39] (providing a description of the Timeline).

setting as an outline to cover their joint defense and contains information that Mr. Leon would not have had but for Mr. Pradel's assistance[,]" to which Agent Burnham responded that "[w]e can make sure that Leon communicates to us verbally everything of importance[,]" [ECF No. 697-1 at 2 (under seal)]; and (2) statements from Leon and Johansson to the OPR investigators that the Government, specifically Agent Masmela and AUSA Davidson, was aware of several defense meetings that Leon secretly attended and that Leon's attendance was approved by the Government in advance, *see* [ECF No. 697-2 at 2–3 (under seal)]. These disclosures revealed that the Government knowingly provided materially inaccurate information to the Court during the pretrial proceedings.

On January 23, 2019, and pursuant to court order, *see* [ECF No. 620], the Government produced 12 additional items procured from the OPR's investigation into this matter, including internal emails, the testimony of the prosecution team, and the testimony of Leon and Johansson. These documents revealed that the prosecution team knew that Leon was providing them with information he received from the other defendants and their lawyers; that AUSA Davidson and Agent Masmela personally approved each of Leon's meetings with his co-defendants and their lawyers despite the JDA, even though Davidson told the Court otherwise; that the prosecutors were fully aware of, and openly discussed, the existence of the JDA before they argued to the Court that they did not know of its existence; that the Government knowingly received and had in its possession the written Timeline and a set of handwritten notes from Leon containing joint defense information; and that the prosecution team had multiple communications about these documents in the months leading up to the hearings, yet testified and argued to the Court that they had nothing.

Based on these disclosures, Pisoni, Pradel, and Ramirez filed the instant Motion, seeking dismissal or a new trial. Based on this record, the Motion is granted.

## DISCUSSION

"A motion for a new trial . . . is addressed to the sound discretion of the trial judge." *United States v. Williams*, 613 F.2d 573, 575 (5th Cir. 1980).[7] In "the interest of justice[,]" a district court may grant a defendant's motion for a new trial. Fed. R. Crim. P. 33(a). If the motion for a new trial is based on newly discovered evidence, the motion must be filed within three years of the verdict. Fed. R. Crim. P. 33(b)(1). "Newly discovered evidence need not relate directly to the issue of guilt or innocence to justify a new trial, but may be probative of another issue of law." *United States v. Scrushy*, 721 F.3d 1288, 1304 (11th Cir. 2013) (citing *United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006) ("For instance, the existence of a *Brady* violation, as well as questions regarding the fairness or impartiality of a jury, may be grounds for a new trial.")). This includes "the fairness of the trial itself." *United States v. Pendleton*, 447 F. App'x 978, 983 (11th Cir. 2011) (per curiam) (citing *Williams*, 613 F.2d at 575 (finding that a motion for a new trial is appropriate where the newly discovered evidence "goes to the fairness of the trial")).

To obtain a new trial under Rule 33, a defendant must ordinarily show:

> (1) that the evidence was newly discovered and was unknown to the defendants at the time of the trial; (2) that the evidence was material, not merely cumulative or impeaching; (3) that it would probably produce an acquittal; and (4) that failure to learn of the evidence was due to no lack of diligence on the part of the defendants.

*Williams*, 613 F.2d at 575. Where the "evidence goes to the fairness of the trial rather than to the question of guilt or innocence . . . a corollary to the third requirement stated above would be that the newly discovered evidence would 'afford reasonable grounds to question . . . the integrity of the verdict'" *Id.* (citations omitted)). Evidence that would afford reasonable grounds to question the integrity of the verdict includes "evidence that goes to prosecutorial misconduct[.]" *Scrushy*,

---

[7] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

721 F.3d at 1308.

The new evidence brought before the Court reveals that the prosecution team knowingly made misrepresentations to the Court to evade dismissal of the Indictment and/or disqualification. In its pleadings and at the hearing on the motion to dismiss, the Government insisted it did not know that Leon repeatedly met with the defense team after signing the plea agreement and actively solicited information at these meetings. The Government also insisted that it did not obtain any privileged information from Leon. The new evidence, including the OPR investigation testimony, establishes that those representations were untrue. In actuality:

- A. The Government knew that Leon was meeting with his co-defendants and their lawyers, and AUSA Davidson and Agent Masmela personally approved Leon's attendance at those meetings.

- B. Despite the Government's representations to the Court that it never received any privileged information, the Government received, and maintained in its possession, written privileged documents. The prosecution team exchanged emails acknowledging that the information they were getting from Leon was prepared with Pradel in preparation for trial. The Government also had an intent to obtain further privileged information from Leon "verbally."

- C. The Government falsely represented to the Court that it was not aware of the JDA, even though the prosecution team exchanged emails in which they discussed the existence of the JDA.

This misconduct by the prosecution team compromised the integrity of this whole proceeding.

A. **The Government Violated the Defendants' Sixth Amendment Rights and Deliberately Displayed a Lack of Candor with the Court.**

The Sixth Amendment of the United States Constitution guarantees criminal defendants "the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). There is no doubt that this right "is a bedrock principle in our justice system." *Martinez v. Ryan*, 566 U.S. 1, 12 (2012). This right may be improperly compromised by government actions that interfere with an attorney's ability to conduct the defense. *See United States v. Terzado-Madruga*, 897 F.2d 1099, 1109 (11th Cir. 1990) ("Once the right to counsel has attached . . . law enforcement authorities must take no action that 'circumvents, and thereby dilutes the protection afforded by the right to counsel.'" (citation omitted)). In certain circumstances, the Government's use of an informant to invade the defense camp is a violation of the Sixth Amendment. Those circumstances are present here. The new disclosures establish that the Government impermissibly invaded Pisoni, Pradel, and Ramirez's fundamental and essential rights under the Sixth Amendment. *See Gideon v. Wainwright*, 372 U.S. 335, 342–45 (1963) (holding that Sixth Amendment rights are fundamental and essential to a fair trial).

"A communication is protected by the attorney-client privilege and . . . is protected from government intrusion under the Sixth Amendment if it is intended to remain confidential and was made under such circumstances that it was reasonably expected and understood to be confidential." *United States v. Melvin*, 650 F.2d 641, 645 (5th Cir. 1981). "[T]he attorney-client privilege applies to confidential communications among attorneys and their clients for purposes of a common defense." *Id.* The Sixth Amendment's protections apply "to an 'indirect and surreptitious interrogation' made possible through the use of informants." *Terzado-Madruga*, 897 F.2d at 1109 (quoting *Massiah v. United States*, 377 U.S. 201, 206 (1964) (Sixth Amendment violation where prosecutor allowed informant co-defendant to "continue his normal associations" in order to obtain

9

incriminating information))*; see also Coplon v. United States*, 191 F.2d 749, 757 (D.C. Cir. 1951) ("It is well established that an accused does not enjoy the effective aid of counsel if he is denied the right of private consultation with him."). And "regardless of who initiates the conversation, the Sixth Amendment is violated whenever a government informant actively engages a defendant in conversation that is likely to elicit incriminating statements about the defendant's upcoming trial." *Terzado-Madruga*, 897 F.2d at 1110.

An invasion into the defense camp is an egregious intrusion in which "a member or confidant of the defense team acts effectively as an informant for the government regarding defense preparation and strategies in the case." *United States v. Levy*, No. 10-60159-CR, 2010 WL 2541881, at *3 (S.D. Fla. June 22, 2010). This type of "intrusion by the Government on the confidential relationship between a criminal defendant and his attorney . . . violates a defendant's Sixth Amendment right to counsel." *Id.*; *see also United States v. Zarzour*, 432 F.2d 1, 5 (5th Cir. 1970) (holding that a new trial is warranted if "it is learned that information concerning appellant's case was transmitted to the prosecution so as to violate his Sixth Amendment rights"). However, "it is clear from the Supreme Court's analysis in [*Weatherford v. Bursey*, 429 U.S. 545 (1977)] that there are levels of intrusiveness, and not all the levels rise to a violative status*." United States v. Posner*, 637 F. Supp. 456, 459 (S.D. Fla. 1986); *see United States v. Noriega*, 764 F. Supp. 1480, 1489, 1490 n.8 (S.D. Fla. 1991) (identifying various factors based on *Weatherford* to consider in determining the requisite amount of prejudice to establish a Sixth Amendment violation and noting that it "need not be outcome determinative" (internal quotations and citation omitted)). To establish a Sixth Amendment violation, there needs to be a showing of "at least a realistic possibility" of prejudice in terms of injury to the defendant or benefit to the Government. *Weatherford*, 429 U.S. at 558.

      1.      *The Government knowingly invaded the defense camp.*

Based on the evidence presented at the hearing on the motion to dismiss, the Court found that the Government allowed Leon to attend at least one meeting with his co-defendants and their attorneys after the February Debrief and that Leon provided confidential information he obtained from the defense team meetings to the Government. Although the prosecution team feigned ignorance about the number of times Leon attended those meetings and whether he provided the Government with confidential information, the OPR investigation reveals that Leon attended numerous privileged meetings with his co-defendants and their lawyers and that he did so with the Government's explicit authorization. Throughout the course of the meetings, Leon obtained privileged information, some of which was communicated to, and relied on by, the Government.

During the pretrial proceedings, the Government repeatedly told the Court that its actions were not improper because it did not know of any meetings other than the first, and that it followed a policy of deliberately failing to learn whether Leon was meeting with the others. *See* [ECF No. 227 at 143–45] (Agent Masmela testifying that he "was only aware of one meeting" and did not discuss with Leon after the February Debrief whether he had any other meetings); *see also* [ECF No. 162-2] (June 3, 2016 email from the Government to the defense team asserting that this was the first day the prosecutors learned of "any meetings" and that it had been only an agent who authorized attendance at the defense team meeting). The Court also directed specific questions to AUSA Davidson on this very issue:

> The Court:     Well, what became apparent from the hearing is the Government was aware of one meeting and gave some directions to Mr. Leon regarding that one meeting.
>
> Mr. Davidson: Correct, Your Honor.
>
> The Court:     But despite that, there were few to several meetings which occurred for which you are telling me the Government was not aware or which I heard

11

      today that the Government was not made aware.

  Mr. Davidson: Correct, Your Honor, we were not told about the subsequent meetings . . . .

* * *

  The Court:    At a minimum, there were – just the fact that there were meetings that the Government was not made aware of by Mr. Leon or Mr. [Johansson]. Right?

  Mr. Davidson: Correct, yes.

[ECF No. 227 at 221].

These assertions were knowingly false when made. As the new evidence makes clear, not only did the Government know that Leon was repeatedly meeting with the defense team, but the Government also gave Leon advance permission to attend each meeting. The new prosecutors summarized Leon's OPR testimony as follows:

> Leon received instructions to communicate with Agent Masmela prior to any type of meeting, call, or any type of contact to ask Masmela if it was okay to attend or be part of the call. Leon reported that he never deviated from that instruction and that he contacted Masmela before any group phone call or physical meeting. Leon reported that when he asked for permission from Masmela, Masmela said that he needed to check with AUSA Davidson and Masmela would typically inform Leon a day or so later that he could attend the meeting or be part of the call, but that he was to try to not speak and just listen.

[ECF No. 697-2 (under seal)]; *see* [ECF No. 697-8 at 30–32, 39 (under seal)] (Leon testifying to the OPR that he communicated every single meeting or phone call to Agent Masmela in advance, and that Masmela would call him back after talking with "Mr. Ron" a day or two later to approve the meeting).

Leon's testimony was corroborated by Johansson, his attorney. According to Johansson, "Davidson said that Leon was to get Masmela's permission for each meeting and to check back in after each meeting." [ECF No. 697-7 at 6 (under seal)]. Johansson confirmed that these instructions were followed. He "strongly emphasized . . . that after February 17, 2016, the government knew

12

about every meeting Leon attended with his co-defendants. He said that, for example, Leon would tell Masmela that he would be meeting Pradel at 'such and such a place.' Leon told Johansson that he had advised Masmela when he had been contacted by the co-defendants." *Id.* at 4. Moreover, "Johansson told OPR that he was pretty sure he told Davidson that he did not like the idea [of Leon attending defense meetings with the other defendants] but that Davidson responded to the effect that Leon wants to get time knocked off, and this is what it takes." *Id.* Significantly, Leon and Johansson's version of events is bolstered by Agent Burnham's OPR testimony that Leon "was supposed to tell Bryan [Masmela] if there were any upcoming meetings" and that it was AUSA Davidson who was doing the authorizing. [ECF Nos. 697-4 at 63, 79–80 (under seal)].

The unfortunate truth is that the prosecution team lied to the Court about Leon's cooperation in their attempt to avoid dismissal of the Indictment and their disqualification. And this deception was not limited to the Court. AUSA Davidson also misled defense counsel and Government investigators. *See* [ECF No. 162-2] (June 3, 2016 email from the Government to the defense team asserting that this was the first day the prosecutors learned of "any meetings" and that it had been only an agent who authorized attendance at the defense team meeting); [ECF No. 697-5 at 182 (under seal)] (AUSA Levitt's OPR testimony that AUSA Davidson told his supervisor that the agents, and not himself, had authorized Leon to attend defense meetings); [ECF No. 697-3 at 55 (under seal)] (Agent Masmela's OPR testimony that, "I got a little annoyed, like, so what are you trying to say that we gave, the agents gave these instructions? . . . I mean, you, you [Davidson] gave these instructions. I was never going to give these instructions." ).[8]

---

[8] At around this time, according to Agent Masmela, AUSA Davidson was "basically trying to do a CYA" and suggested to Masmela that he should write a report taking responsibility for having authorized Leon's invasions when in fact it was Davidson who had authorized them. [ECF No. 697-3 at 82–84 (under seal)].

13

   2. *The Government knowingly obtained and relied on privileged information.*

  Following the evidentiary hearing on the motion to dismiss, the Court found that the Government improperly invaded the defense camp after Leon agreed to cooperate and that the Government received some privileged information from Leon. [ECF No. 227 at 241–43]. Based on the Government's representations that it did not intentionally invade the defense camp and that the AUSAs and agents were only aware of one such meeting, the Court placed the blame primarily on Leon as a rogue actor. *Id*. at 243–44. The Court denied the motion to dismiss, finding no substantial prejudice to Pisoni, Pradel, and Ramirez because much of the information the Government received from Leon was largely already known to it. *Id.* at 244. The Court wrongly concluded that the prosecution team was merely naïve for trusting Leon. But, based on the new evidence, it is clear that the Government misled the Court and the defense regarding its role in invading the defense camp and its receipt of privileged information.

  Throughout the pretrial proceedings, the Government repeatedly told the Court that it never took possession of any written material and that it did not knowingly obtain any privileged information from Leon. The following are some of the statements made to the Court:

- "Leon never disclosed any post-indictment conduct, defense strategies, or materials subject to work product." [ECF No. 169 at 3].

- "Leon never shared privileged information with the United States[.]" *Id.*

- "There is no evidence that the United States obtained confidential information pertaining to trial preparations and defense strategy as a result of any alleged intrusion[.]" *Id.* at 4.

- "We didn't get text messages. We didn't get the [T]imeline. We didn't get anything." [ECF No. 227 at 229].

- "Your Honor, you have two sworn law enforcement officials who I submit have testified truthfully before Your Honor that they never asked, they never inquired, they

    were never given, they didn't want. We don't want the text messages. We don't want your [T]imeline. We don't want anything to know about what's going on." *Id.* at 226.

- "As far as I know, [the Timeline has] never been turned over to the Government[.]" *Id.* at 123.

- "And you heard repeated testimony that the Government . . . did not obtain the text messages . . . did not obtain the finalized Pradel [T]imeline . . . did not obtain this [corporate] tree or structure." *Id.* at 220.

These statements were knowingly false when made. The evidence reveals that the Government took possession of written, privileged documents from Leon, *i.e.*, the Timeline and his written notes; repeatedly discussed having that information; and developed a plan to orally receive important privileged information from Leon. *See* [ECF No. 697-1 (under seal)].

    On February 23, 2016, shortly after the February Debrief, the prosecution team exchanged emails which reveal that the Government took possession of the privileged Timeline knowing it was privileged. *Id.* ("[T]he document was prepared in a private setting as an outline to cover their joint defense and contains information that Mr. Leon would not have had but for Mr. Pradel's assistance.").[9] This is corroborated by the prosecution team's testimony to the OPR. *See* [ECF No. 697-5 at 69–70 (under seal)] (AUSA Levitt's testimony to the OPR that he "got the [T]imeline off the table" and "still had custody of" it once the meeting ended). In fact, Leon told the Government at the February Debrief that the Timeline was prepared with Pradel's involvement. [ECF No. 697-3 at 19 (under seal)] (Agent Masmela: "[The prosecutors] asked [Leon] if [the Timeline] was produced by him, and he said it was produced between him and Marcus Pradel[]."); [ECF No. 697-5 at 63–64 (under seal)] (AUSA Levitt: "I asked the question: How did you have that [Timeline]?

---

[9] These emails also reveal that the Government was aware of the JDA, contrary to its arguments to the Court. During his OPR interview, AUSA Levitt stated that he and AUSA Davidson discussed, on February 23, 2016, that there was a JDA in place and that the "Pradel [T]imeline was prepared for litigation[.]" [ECF No. 697-5 at 156–57 (under seal)]. Thus, AUSA Davidson's statement to the Court that "based on the information we had at the time, we didn't know about a joint defense agreement" appears to be untrue, at least as to Leon's meetings with Pisoni, Pradel, and Ramirez after the February Debrief. [ECF No. 227 at 228].

15

. . . And he said that he created it with Marcus Pradel. And my next question was: When did you create that document? And John said that it was at the end of January."); [ECF No. 697-11 at 14 (under seal)] (AUSA Davidson's statement to the OPR acknowledging that Leon told the Government that he had worked on the Timeline with Pradel). According to Agent Masmela, it appeared that Leon had prepared it for the very purpose of cooperating. [ECF No. 697-3 at 23–24 (under seal)]; *see also* [ECF No. 697-9 at 16, 18 (under seal)] (AUSA Levitt's statement to the OPR that at the August 3, 2016 hearing, "the real issue arose: John Leon had divulged privileged joint defense materials to the Government during the February 17, 2016 debriefing and had actively solicited this information from the defense camp between January 20, 2016, and February 17, 2016.").

Based on this record, the prosecution team's original assertion that they did not know that Leon was revealing privileged information to them is not credible. In addition to taking possession of the Timeline, the Government allowed Leon to refer to the Timeline and orally disclose substantive information from it. *See* [ECF No. 697-3 at 21 (under seal)] (Agent Masmela's testimony to the OPR that the instructions were that Leon "could look at" the Timeline and "could actually refer to it"). Even more troublesome, the Government actively sought to work around the protections of privilege. *See* [ECF No. 697-6 at 72 (under seal)] (Agent Burnham's email to the prosecution team that "[w]e can make sure that Leon communicates to us verbally everything of importance"). Furthermore, Agent Burnham's OPR interview revealed that the Government also took a set of Leon's written notes that contained information provided by the other defendants, which Leon had prepared after the Indictment. *See* [ECF No. 697-4 at 93 (under seal)]; *see also* [ECF No. 697-8 at 6–8 (under seal)] (Leon's description of his notes). Agent Burnham forwarded these notes to AUSAs Davidson and Levitt by email on July 27, 2016 (in advance of the pretrial

hearings) and expressly advised that they had been provided by Leon at his first proffer. *See* [ECF No. 697-4 at 93 (under seal)]; [ECF No. 697-6 at 55–62 (under seal)].

Shockingly, throughout the entirety of the pretrial proceedings, the Government lied to the Court about its possession of privileged materials even though the prosecution team discussed this issue leading up to the motion to dismiss hearings. *See* [ECF No. 697-5 at 69–74; 97–107 (under seal)] (AUSA Levitt's testimony to the OPR about the Government's possession of the Timeline in February 2016, his discussion of the Timeline with AUSA Davidson around May or June of 2016, and his acknowledgment that the agents provided false testimony to the Court about the Timeline at the evidentiary hearing). The OPR questioned AUSA Levitt at length about the incongruity between the testimony Levitt elicited at the evidentiary hearing and the Government's actions in the months leading up to the hearing. Instead of taking any responsibility, AUSA Levitt was elusive in his answers. At times, he argued that he simply forgot about the document, that there was not a need to disclose it, and that he chose to hide the information as "there were really strong feelings going through this office because of what the judge said. And it just seem[ed] to be adding fuel to the fire[.]" *Id.* at 98–107, 201 (under seal). As noted above, it appears that the Government intentionally deceived the Court to evade dismissal and disqualification. *Id.* at 111 ("I probably didn't tell a supervisor because I was embarrassed to bring it up . . . I was in a corner where I didn't know where to go. And I plugged -- I forged ahead as if I had lost it or if I didn't even have it. I was on a roll with the witnesses . . . .").

**B.     The Government's Misconduct Requires a New Trial.**

At the initial August 2016 hearing, the Court admonished the Government, noting the dangerousness its tactics posed to the fairness of the judicial system. *See* [ECF No. 198 at 20–21] ("[I]t's pretty distasteful to have a cooperator participating in private discussions between

codefendants or former codefendants and their counsel . . . it's really problematic and in a way I'm not really sure the Government understands."). As the Court explained, this type of intrusion "is not the norm[.]" [ECF No. 226 at 16–17]. However, at the time the Court made these statements, it did not know the extent of the Government's purposeful intrusion into the defense camp; nor did it know that the Government had intentionally misled the Court on this very point. The new revelations show that the invasion was not simply a deviation from the norm; rather, it was unquestionably unconstitutional.

The Government's misconduct here violated Pisoni, Pradel, and Ramirez's Sixth Amendment rights. This case is distinguishable from the likes of *Weatherford*. *See Weatherford*, 429 U.S. at 556 (finding no Sixth Amendment violation where an undercover government informant attended two pretrial meetings with a defendant and his counsel but "communicated nothing about the two meetings to anyone else"); *see also United States v. Ofshe*, 817 F.2d 1508, 1515 (11th Cir. 1987) (finding no Sixth Amendment violation where the defendant's attorney acted as an informant and a bugged conversation revealed some information about the pending case because that information "was part of this public record" and "nothing pertinent to the [pending] case was communicated to the United States Attorney assigned" to the case). The Government intentionally and improperly invaded the defense camp on several occasions, obtained privilege information, and, at least in part, relied on that information. The Government's intrusion into the confidential relationship between the defendants and their attorneys "created at least a realistic possibility of injury to [the defendants] or benefit to the State." *Weatherford*, 429 U.S. at 558.

This newly discovered evidence of prosecutorial misconduct is material. *See United States v. Espinosa-Hernandez*, 918 F.2d 911, 914 (11th Cir. 1990) (per curiam) (noting that if the newly discovered evidence would show the government case agent committed perjury in the trial or a

18

related proceeding that "evidence would be beyond that of mere impeachment and a new trial would be necessary to 'remove the taint' from [the defendant's] conviction"); *United States v. Soghanalian*, 784 F. Supp. 860, 863 (S.D. Fla. 1992) ("[T]he question of materiality rests in the discretion of the trial court."). The Government's misconduct had a direct bearing on the Court's pretrial decisions to deny the motion to dismiss, [ECF No. 221], and motion to disqualify the prosecution team, [ECF No. 256]. Had the Court been aware of the Government's knowing receipt of privileged information and the extent of the Government's purposeful invasion of the defense camp, it would have at least granted the motion to disqualify the prosecution team that tried the case. The Court also finds that the Government's misconduct had a direct bearing on the jury's verdict. Notably, the jury only found Pisoni, Pradel, and Ramirez guilty of a single conspiracy count and acquitted them of all remaining counts, including all the substantive counts. No reasonable person could conclude that the Government's limited victory was not influenced by the privileged information it improperly received. This goes directly to the fairness of the trial and provides reasonable grounds to question the integrity of the proceedings.

Finally, the post-trial discovery of this new evidence cannot be attributed to a lack of diligence on the part of the defense. Importantly, the new evidence was not revealed until new prosecutors replaced AUSAs Davidson and Levitt. Therefore, a new trial is warranted with a new prosecution team.[10]

## CONCLUSION

Ultimately, the issues here are fairly straightforward: (1) the prosecution team acted

---

[10] Based on the Court's findings of prejudice and misconduct, it also finds that disqualification is necessary. *See United States v. Kachkar*, No. 16-20595-CR, 2018 WL 6974949, at *3 (S.D. Fla. Dec. 26, 2018) ("Defendant bears the same burden of showing misconduct and prejudice with regard to his request for disqualification of the prosecution team, which is similarly based on his claim of government violations of the attorney client privilege."), *report and recommendation adopted*, No. 16-20595-CR, 2019 WL 113740 (S.D. Fla. Jan. 4, 2019), *aff'd*, No. 19-12685, 2022 WL 2704358 (11th Cir. July 12, 2022).

improperly by invading the defense camp; (2) they lied to the Court about it; and (3) the lies affected the Court's rulings and, likely, the jury's verdict. The Defendants argue that this conduct warrants a new trial. The Court agrees. It is the "duty of the judiciary . . . to seek and to find the proper balance between the necessity for fair and just trials and the importance of finality of judgments." *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1913 (2017). Recognizing the importance of this duty, the Court exercised great caution in rendering this decision.[11] But, the Government's actions offend bedrock principles of the American criminal justice system: the integrity of the courts, the legitimacy of the adversarial process, and the assurance of justice. The Court will not tolerate willful violations of the Defendants' constitutional rights or deception by officers of the Court. To preserve the integrity of these proceedings, the Court finds that the Government's misconduct warrants vacatur of Pisoni, Pradel, and Ramirez's convictions and sentences and that a new trial must occur.

Accordingly, it is **ORDERED AND ADJUDGED** that Defendants' Joint Motion for New Trial, [ECF No. 694], is **GRANTED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 18th day of November, 2022.

_____
DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

---

[11] The Court hoped to consider the findings of the very thorough OPR investigation, but the Court can wait no longer.